T.C. Memo. 2004-174

UNITED STATES TAX COURT

ESTATE OF JOSEPHINE T. THOMPSON, DECEASED,
CARL T. HOLST-KNUDSEN AND THE BANK
OF NEW YORK, EXECUTORS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4939-02.                    Filed July 26, 2004.


<u>Kirk H. O'Ferrall</u>, <u>Robert H. Goldie</u>, <u>Jonathan G. Blattmachr</u>,

<u>Andrew E. Tomback</u>, <u>Edward A. Stelzer</u>, and <u>Jonathan W. Wolfe</u>, for

petitioner.

<u>Robert A. Baxer</u> and <u>Joseph J. Boylan</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined a deficiency of

$17,910,408 in the Federal estate tax of the estate of decedent

Josephine T. Thompson and a $7,164,163 accuracy-related penalty under section 6662(a).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect on May 2, 1998, the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are:  (1) The fair market value of 487,440 shares of the voting common stock of Thomas Publishing Co., Inc. (TPC), that were owned by decedent on her death; and (2) whether the estate is liable for the accuracy-related penalty.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

On May 2, 1998, the date of her death, decedent resided in New York.

On May 14, 1998, Carl T. Holst-Knudsen (Holst-Knudsen), decedent's son, and The Bank of New York were appointed by the Surrogate Court of the State of New York, County of Westchester, as co-executors of decedent's estate.  Holst-Knudsen resides in New Jersey, and The Bank of New York is headquartered in New York City.

TPC is a private, closely held corporation that was formed over 100 years ago, on January 28, 1898, as a New York

corporation.  At the time of trial, TPC's principal place of business was located in New York City.

The 487,440 shares of TPC voting common stock that decedent owned constituted 20.57 percent (hereinafter generally rounded to 20 percent) of TPC's total outstanding common stock.  Decedent's shares constituted the largest block of TPC common stock owned by any single stockholder.[1]

On May 2, 1998, all but 300,000 shares of the remaining TPC common stock were owned by approximately 20 other relatives of Harvey Mark Thomas, the founder of TPC.

Holst-Knudsen was designated as the sole testamentary beneficiary of decedent's 487,440 shares of TPC common stock.  As of May 2, 1998, taking into account the 162,000 shares of TPC common stock that he already owned and the 487,440 shares that he inherited from decedent, it appears that Holst-Knudsen individually and beneficially owned 649,440 shares of TPC stock or approximately 27 percent of the total outstanding TPC common stock.

The last 300,000 shares of TPC common stock, representing 12.66 percent of the total outstanding TPC common stock, were owned by an outside stockholder -- namely, Capital Cities/ABC,

---

[1]  Decedent also owned 237.6 shares of TPC nonvoting preferred stock the value of which is not in dispute.

Inc., a New York Stock Exchange publicly traded company.[2]  As of the date of decedent's death, Capital Cities/ABC, Inc., or its predecessor, apparently had owned these shares of TPC common stock for at least 10 years.

During 1998 and subsequent years through the time of trial in 2003, Holst-Knudsen was president and Jose E. Andrade was chairman of the TPC board of directors.  Both Holst-Knudsen and Andrade are grandsons of Harvey Mark Thomas, TPC's founder.

None of the shares of TPC common stock has ever been publicly traded, and, in the 10 years before decedent's death and in the years after decedent's death through the time of trial, no sales of TPC common stock occurred.  Also, as of May 2, 1998, no buy/sell agreement or stockholder agreement affecting the value of TPC common stock was in existence.

Over the years, TPC's primary business has been the production and sale of industrial and manufacturing business guides and directories.  TPC's business directories provide

---

[2] In 1996, the Walt Disney Co. (Disney) acquired Capital Cities/ABC, Inc., for $19 billion.  The TPC stockholder list in evidence apparently does not take into account this 1996 Disney acquisition and therefore provides the former name of this outside TPC stockholder.  Herein, we refer to this stockholder as shown on TPC's stockholder list.

detailed information on products and services, company profiles, contact information, and catalog files.[3]

As of May 2, 1998, TPC published and sold throughout the United States and abroad approximately 24 business-to-business industrial business directories, including the Thomas Register of American Manufacturers (the Thomas Register), TPC's 34-volume directory which is recognized throughout North America as the most comprehensive resource for finding manufacturing companies and products.  TPC also published and sold a variety of news magazines, software comparison guides, and a magazine relating to factory automation, and it owned a product information exchange service and a custom publishing group.

By any measurement, as of May 2, 1998, TPC was regarded as a very successful and profitable company and by some as holding an effective monopoly in the United States on business-to-business industrial and manufacturing print publications.

---

[3]  The first buying directory was published by Harvey Mark Thomas in 1890, prior to incorporation of the business, and was titled "Thomas' Machinery, Iron, Steel, and Metal Trades Reference Book".

In its own publications, TPC describes itself as follows:


# Thomas
# Publishing
# Company

## Your product information headquarters


For more than 95 years, Thomas Publishing Company has concentrated its full energies on filling one of industry's greatest needs...the need for <u>up-to-date</u> <u>product</u> <u>information</u>.  No other publisher is as totally dedicated to this mission.

Decision makers throughout industry need <u>product</u> <u>information</u> to operate their companies successfully.  Regardless of job function, the hunger for <u>up-to-date</u> <u>product</u> <u>information</u> is universal.  It's given priority attention because industry's appetite for products and services of every type is enormous.  It can be filled only when buying influences have comprehensive, reliable, up-to-date vendor information.  It influences profitability profoundly because dozens of new products enter the marketplace daily -- providing new functional and economic benefits.  To <u>not</u> keep up with these developments means operating without the benefit of these improvements.  And ultimately that means relinquishing market position to one's competitors.

Thomas Publishing Company has become the acknowledged leader in providing industry with the <u>product</u> <u>information</u> it needs.  Today, we publish twenty-four major buying guides, thirty-one product news magazines, two product information exchange services, a magazine on factory automation, and a publication to help buyers select the most cost-efficient transportation modes for their inbound freight.  In addition, Thomas Business Lists offers comprehensive list services for direct marketing.  Also, the Thomas Marketing Information Center helps industrial marketers research and respond to industry's need for new products.  All of these services are described in the pages that follow.

*        *        *        *        *        *        *

Published annually, <u>Thomas</u> <u>Register</u> <u>of</u> <u>American</u> <u>Manufacturers</u> is by far the most complete and helpful specifying and buying guide published today.  It provides "instant" sourcing information on nearly 52,000 industrial products and services, along with comprehensive specifications and availability information from thousands of manufacturers.  In all, more than 1,500,000 individual product/service sources are included.  Thomas Register also contains a complete 2-volume Company Profiles section and a comprehensive 8-volume Catalog File section. Headquarters and branch addresses, phone numbers and asset ratings are provided on more than 148,000 U.S. firms.

For everyone involved in specifying and buying industrial products and services, Thomas Register is invaluable. For everyone involved in selling industrial products and services, Thomas Register is invaluable. [22 Thomas Register of American Manufacturers 3573 (86th ed. 1996).]

The primary sales force for TPC directories was made up of independent salespersons located throughout the United States and Canada. The salespersons were paid on a commission basis with the right to receive commission advances from TPC.

In the early 1990s, the development and increased use of electronic and digital media provided alternatives to the form and manner in which information could be packaged and distributed. For example, the development of CD-ROM format facilitated the transmission of large amounts of data quickly and permitted the user to sort and to access data in different ways.

Also, the development and expansion of the Internet and of Internet search engines allowed traditional buyers of TPC's directories, to a certain extent, to locate and to purchase products on their own without reference to TPC's print directories.

Historically, TPC's buying directories were published only in print or paper format. By the early 1990s, however, it was recognized by TPC's management that the Internet and other technological advances would have an impact on TPC's business, presenting to TPC special challenges, risks, and new competition, but also providing to TPC new growth opportunities.

In 1993, in response to the significant advancements in technology and to increased use by business entities of electronic media, TPC began publishing and offering some of its business-to-business buying directories on CD-ROM.

In 1994, in an internal TPC management publication, the Thomas Register was described as "the undisputed leader * * * in electronic publishing" relating to business-to-business buying directories.  Also, in that same internal publication, a TPC management objective (relating to TPC's continuing competitive position with electronic publishing) was stated as follows:

> Finding ourselves now at such a juncture, we seek an approach to securing for * * * [TPC] a dominant position in the electronic interchange of information among industrial buyers and sellers comparable to that which it has enjoyed in the hard copy realm.

In early 1995, although TPC's management recognized that TPC's historical existence as a print publisher constituted a certain liability in the new electronic environment, TPC's management also recognized that TPC brought "to the competitive electronic information wars ahead" certain "great assets" which were described as "the information that it traffics and the methodologies, relationships and brand name recognition that support that traffic".

In 1995, TPC began publishing and making its directories available for free on the Internet.  The record does not indicate

exactly on which dates TPC's various directories became available on the Internet.

At TPC's 1996 annual stockholder meeting, Holst-Knudsen gave a speech in which he acknowledged that the rapid advancements in technology created uncertainty for the future of TPC, but in which speech Holst-Knudsen also stated that the technological advancements that were occurring constituted a "great" opportunity for TPC.

A colorful excerpt from a January 1998 TPC publication comments on the positive manner by which TPC's management, as of early 1998, was addressing and dealing with the technological challenges TPC faced:

> As the company's flagship, Thomas Register absorbs the brunt of competitive initiative from the various evil empires aiming to unseat us in the new digital world.  Asked to respond with a major Internet launch in 1996 and to add to that a major CD-ROM program in 1997 * * * [Thomas Register's] production, editorial, circulation, sales and administrative people have handled a hailstorm of change and complexity with energy and skill that few would have been bold enough to anticipate only three years ago.

By early 1998, ThomasRegister.com was recognized as one of the 200 leading business-to-business Web sites in the United States.  Among the 200 Web sites so recognized, TPC's Web site was ranked sixth.

For its fiscal years 1993-98, the number of purchasers or subscribers to TPC's print and CD-ROM directories, and the number of subscribers to TPC's Internet directories are set forth below:

| Fiscal Year | Print Subscribers | CD-ROM Subscribers | Internet Subscribers |
|------|------|------|------|
| 1993 | 73,500 | 1,000 | N/A |
| 1994 | 78,000 | 2,500 | N/A |
| 1995 | 81,000 | 5,000 | 40,000 |
| 1996 | 80,000 | 13,000 | 225,000 |
| 1997 | 67,500 | 25,000 | 550,000 |
| 1998 | 45,500 | 45,500 | * |

* Not in evidence

Historically, TPC's revenue was generated from the sale of subscriptions to and advertising in its print directories. For the last 30-plus years, the largest percentage of TPC's revenue was generated from the sale of advertising. For example, for its fiscal year 1972, advertising revenue associated with TPC's directories accounted for 86 percent of TPC's total revenue. By its 1993 fiscal year, advertising revenue associated with TPC's directories accounted for more than 90 percent of TPC's total revenue.

Set forth below for each of TPC's fiscal years 1993-2002 are the numbers for TPC's subscription and advertising revenue and the percentage of TPC's total sales revenue reflected by subscription revenue and by advertising revenue:

| Fiscal Year | Subscription | | Advertising | |
|---|---|---|---|---|
| | Revenue | Percentage of Total Sales Revenue | Revenue | Percentage of Total Sales Revenue |
| 1993 | $14,901,781 | 8.3 | $165,386,826 | 91.7 |
| 1994 | 15,310,520 | 7.9 | 177,924,154 | 92.1 |
| 1995 | 16,978,851 | 7.9 | 197,451,678 | 92.1 |
| 1996 | 17,173,690 | 7.4 | 215,653,261 | 92.6 |
| 1997 | 17,240,197 | 6.7 | 239,828,771 | 93.3 |
| 1998 | 14,068,891 | 5.2 | 257,901,815 | 94.8 |
| 1999 | 8,834,385 | 3.0 | 284,004,912 | 97.0 |
| 2000 | 6,580,888 | 2.2 | 291,617,859 | 97.8 |
| 2001 | * | * | * | * |
| 2002 | 957,646 | 0.4 | 249,187,069 | 99.6 |

&ast;  Not in evidence.

For 1993-2002, decreases in TPC's subscription revenue generally coincided with TPC making its directories available on CD-ROM and on the Internet.  For 1993-2000, however, increases in TPC's advertising revenue relating to CD-ROM and Internet versions of its directories, more than offset decreases in TPC's subscription revenue.

For its fiscal years 1998-2002, TPC's combined subscription and advertising revenue relating to its respective print, CD-ROM, and Internet directories is set forth below:

| Fiscal Year | Combined Subscription and Advertising Sales Revenue | | | |
|---|---|---|---|---|
| | Print Directories | CD-ROM Directories | Internet Directories | Multimedia* |
| 1998 | $60,974,928 | $21,545,793 | $ 3,801,224 | $190,135,238 |
| 1999 | 55,183,301 | 30,148,498 | 11,701,065 | 196,831,426 |
| 2000 | 49,567,582 | 32,233,952 | 20,295,520 | 196,595,142 |
| 2001 | 40,320,705 | 29,578,071 | 27,962,016 | 187,279,835 |
| 2002 | 29,054,729 | 24,285,826 | 29,485,156 | 167,486,238 |

&ast;  Multimedia sales revenue reflects the sale of bundled advertising in TPC's print, CD-ROM, and Internet directories.  Revenue numbers in this table do not match up entirely with the revenue numbers in the table above.

In addition to developing and implementing technology to make its directories available on CD-ROM and on the Internet, TPC engaged in other technology projects.  A list and a brief description of other technology-related projects undertaken by TPC during its 1995-2002 fiscal years are set forth below:

(1)  Development of the nationally recognized TPC Web site;

(2)  Development of TPN Register, a joint venture between TPC and General Electric Co., through which product information similar to information contained in TPC's directories was to be provided to companies via each company's respective internal intranet.  In 2001, TPC apparently terminated this TPN Register project;

(3)  Development of Thomas.Net, a software product that enabled users to use keywords to make online digital searches of TPC's electronic directories for industrial product information;

(4)  Development of Product News Network (PNN), an electronic magazine containing information regarding new industrial products;

(5)  Development in 1995 of Thomas Global Register (TGR), an Internet directory for TPC's customers located outside the United States; and

(6)  Purchase in 1997 of Plant Spec, a Web-based software system that permitted the electronic transfer of computer assisted design (CAD) drawings.

During its 1995-97 fiscal years, TPC spent approximately $36 million on the above technology-related projects.  As of May of 1998, TPC's management anticipated that during 1998-2002 TPC would undertake additional projects, incur additional

expenditures, and realize additional income relating to technology-related projects.

During its 1998-2002 fiscal years, TPC's actual expenditures associated with development and marketing of technology-related projects totaled approximately $234 million.[4]

Set forth below are TPC's technology-related expenditures for its 1995-2002 fiscal years:

| Fiscal Year | TPC Web Site | TPN Register | Thomas.Net | PNN | Plant Spec | TGR | Misc | Total |
|---|---|---|---|---|---|---|---|---|
| 1995 | $ -- | $ 2,901,153 | $ -- | $ -- | $ -- | $ -- | $ 1,310,520 | $ 4,211,673 |
| 1996 | 3,450 | 7,283,842 | 462,942 | N/A | -- | 1,131,845 | 2,336,691 | 11,218,770 |
| 1997 | 3,692,116 | 8,133,557 | 1,670,582 | 1,639,314 | 20,818 | 3,740,603 | 2,146,855 | 21,043,845 |
| 1998 | 6,220,263 | 6,583,382 | 3,681,100 | 3,567,351 | 7,867,906 | 4,092,326 | 2,420,544 | 34,432,872 |
| 1999 | 3,348,521 | 5,800,000 | 5,908,513 | 3,619,148 | 7,445,476 | 5,832,464 | 6,120,977 | 38,075,099 |
| 2000 | 6,534,901 | 16,359,397 | 6,376,417 | 2,278,640 | 10,459,145 | 9,383,771 | 16,772,912 | 68,165,183 |
| 2001 | 8,519,175 | 3,700,000 | 5,797,868 | 2,278,640 | 9,955,829 | 9,383,771 | 16,352,359 | 55,987,642 |
| 2002 | 7,869,933 | -- | 4,173,741 | 930,655 | 4,547,589 | 9,423,411 | 8,101,439 | 35,046,768 |
| TOTAL | $36,188,359 | $50,761,331 | $28,071,163 | $14,313,748 | $40,296,763 | $42,988,191 | $55,562,297 | $268,181,852 |

For its 1993-2000 fiscal years, TPC's reported financial statements reflect steady, consistent, and increasing revenue and show that TPC was profitable through the end of its 1999 fiscal year. As reported, for each of 1993-2000, TPC realized record

---

[4] Apparently, for Federal income tax purposes and in the valuations made by the estate's experts herein, TPC treated all of its technology-related expenditures as current ordinary and necessary business expenses, rather than as capital expenditures. Respondent herein complains mildly about such current expense treatment but stops short of asserting that the technology-related expenditures should have been capitalized and stops short of asking that TPC's financial statements and financial projections be redone to treat such expenditures as capital in nature.

total revenue and, as of the end of TPC's 1997 fiscal year, TPC's financial data reflected shareholder equity of $148,605,729.

As of May of 1998, TPC had reported positive net income for every year for the prior 24 years, and the then-current in-house management financial forecast for TPC estimated net profits for 1998.

In late 1997, TPC's senior management, while acknowledging significant challenges, predicted that 1998 would be better than 1997 and "our best [year] ever."

For each of its 1993-98 fiscal years, TPC's net sales revenue, expenditures (including TPC's technology-related developmental expenditures), operating income, and total net income, as reported on TPC's financial statements, are reflected in the table below:

| Fiscal Year | Net Sales Revenue | Expenditures | Operating Income | Total Net Income |
|---|---|---|---|---|
| 1993 | $168,059,000 | $142,602,855 | $25,456,145 | $14,333,288 |
| 1994 | 179,287,018 | 148,510,315 | 30,776,703 | 12,804,431 |
| 1995 | 200,487,153 | 170,208,645 | 30,278,508 | 11,107,716 |
| 1996 | 216,924,156 | 199,871,672 | 17,052,484 | 13,171,595 |
| 1997 | 240,116,975 | 217,559,833 | 22,557,142 | 15,927,549 |
| 1998 | 256,806,493 | 231,436,437 | 25,370,056 | 18,024,858 |

Also at the end of each of its 1993-98 fiscal years, TPC owned substantial liquid short-term investments and marketable securities as set forth below:

| Fiscal Year | Short-Term Investments | Marketable Securities | Total Liquid Investments |
|---|---|---|---|
| 1993 | $38,052,200 | $10,264,800 | $48,317,000 |
| 1994 | 45,640,865 | 12,050,249 | 57,691,114 |
| 1995 | 52,919,162 | 18,292,503 | 71,211,665 |
| 1996 | 50,915,037 | 21,986,280 | 72,901,317 |
| 1997 | 68,993,367 | 28,261,773 | 97,255,140 |
| 1998 | 68,687,060 | 29,988,533 | 98,675,593 |

For each of its 4 fiscal years (1999-2002), subsequent to the year in which decedent died, TPC's net sales revenue, expenditures (including TPC's technology-related developmental expenditures), operating income or loss, and total net income or loss, as reported on TPC's financial statements, are reflected in the table below:

| Fiscal Year | Net Sales Revenue | Expenditures | Operating Income (Loss) | Total Net Income (Loss) |
|---|---|---|---|---|
| 1999 | $273,386,403 | $253,677,683 | $19,708,720 | $14,988,447 |
| 2000 | 278,741,064 | 282,500,513 | (3,759,449) | (5,477,876) |
| 2001 | 267,003,996 | 278,332,392 | (11,328,396) | (13,807,358) |
| 2002 | 234,832,485 | 234,323,041 | 509,444 | 1,738,420 |

At the end of each of its 1999-2002 fiscal years, TPC continued to own substantial liquid short-term investments and marketable securities as set forth below:

| Fiscal Year | Short-Term Investments | Marketable Securities | Total Liquid Investments |
|---|---|---|---|
| 1999 | $77,529,513 | $36,787,208 | $114,316,721 |
| 2000 | 32,501,250 | 45,582,058 | 78,083,308 |
| 2001 | 20,279,591 | 37,594,522 | 57,874,113 |
| 2002 | 27,752,994 | 34,207,692 | 61,960,686 |

TPC had a long history of paying annual cash dividends to its stockholders. In each of its 1993-2002 fiscal years, including in its 2 loss years of 2000 and 2001, TPC paid cash

dividends on its outstanding common stock ranging from a low of
$.85 per share in its 1993 fiscal year to a high of $3.21 per
share in its 1998 fiscal year.  The total and the per-share cash
dividends paid by TPC in its 1993-2002 fiscal years to its common
and to its nonvoting preferred stockholders is set forth below:

| Fiscal Year | Total Cash Dividends | Cash Dividends Per Share | |
| --- | --- | --- | --- |
| | | Common | Preferred* |
| 1993 | $2,022,900 | $0.85 | $6 |
| 1994 | 2,259,900 | 0.95 | 6 |
| 1995 | 2,259,900 | 0.95 | 6 |
| 1996 | 2,259,900 | 0.95 | 6 |
| 1997 | 2,615,400 | 1.10 | 6 |
| 1998 | 7,616,100 | 3.21 | 6 |
| 1999 | 2,615,400 | 1.10 | 6 |
| 2000 | 2,615,400 | 1.10 | 6 |
| 2001 | 2,828,700 | 1.10 | 6 |
| 2002 | 2,899,800 | 1.22 | 6 |

*   TPC only had 1,400 shares of nonvoting preferred
    stock and approximately 99 percent of TPC's cash
    dividends paid each year were paid to TPC's common
    stockholders.

As of May of 1998, TPC's management planned to continue paying
annual cash dividends to its stockholders.

As of the date of decedent's death in May of 1998, the
management of TPC had no intent to liquidate or to sell TPC.

In the early fall of 1998, in anticipation of the filing of
a Federal estate tax return on behalf of the estate, even though
he lived in Alaska, the executors of the estate hired George E.
Goerig (Goerig), an Alaskan lawyer to appraise and to prepare a
valuation report for the estate's 20-percent stock interest in
TPC.

Also, on November 16, 1998, the executors of the estate filed a petition with the Surrogate Court of the State of New York, County of Westchester, requesting that limited estate administrative powers be granted to Goerig for the purposes of representing decedent's estate in connection with the anticipated audit by respondent of the estate's Federal estate tax return and of handling the anticipated negotiations with respondent over the fair market value of decedent's 487,440 shares of TPC stock.  On December 18, 1998, the court granted to Goerig such limited estate administrative powers.

The acknowledged reason the estate hired Goerig (to value the TPC stock owned by decedent and to represent the estate as administrator) was to have respondent's audit of decedent's Federal estate tax return conducted not by respondent's New York City office but by respondent's Alaska office, where Goerig believed and apparently represented to the estate's representative that he would be able to obtain for the estate a more favorable valuation of the estate's TPC stock.

Executors for the estate had learned about Goerig from an attorney for decedent's family who had met Goerig on a fishing trip.

TPC's financial books and records were maintained on the basis of a fiscal year ending September 30.

On approximately February 2, 1999, the executors of the estate timely filed on behalf of the estate a Federal estate tax return, whereon the estate, based on a valuation report of Goerig and Paul M. Wichorek (Wichorek), an Alaskan accountant whom Goerig had hired to assist him in the valuation, reported a total value of $1,750,000 for the estate's 20-percent stock interest in TPC, or $3.59 per share ($1,750,000 ÷ 487,440 shares = $3.59 per share).

On audit, based on a valuation report dated November 9, 2000, prepared by Brian C. Becker, a valuation expert hired by respondent, respondent determined a total value of $35,273,000 for the estate's 20-percent stock interest in TPC, or $72.36 per share ($35,273,000 ÷ 487,440 = $72.36), and respondent determined an estate tax deficiency of $17,910,408. Respondent also determined that the entire $17,910,408 estate tax deficiency determined was attributable to a substantial understatement and therefore that under section 6662 the estate was subject to a $7,164,163 gross valuation understatement penalty.

Shortly before trial, respondent's expert prepared a revised valuation report in which respondent's expert adjusted downward his valuation of the estate's 20-percent TPC stock interest from

$35,273,000 to $32,387,730, or from $72.36 per share to $66.45 per share ($32,387,730 ÷ 487,440 = $66.45).[5]

Respondent's expert's revised valuation of the estate's TPC stock interest was necessitated by errors in his original report. In his original valuation, respondent's expert had added back to his calculation of TPC's 1997 cashflow (which was the basis for his TPC cashflow estimates for 1998-2002) deferred income taxes of $13,294,000, although the correct amount of deferred taxes that should have been added back to TPC's 1997 cashflow was only $1,609,793.

Also shortly before trial, the estate's experts prepared an "updated" or revised valuation report to make the estate's original report "more readable", in which revised report the estate's experts again opined that the May 2, 1998, date-of-death value of the estate's TPC common stock was $1,750,000, or $3.59 per share.

OPINION

Generally, under section 2031(a) the value of a decedent's gross estate is based on the fair market value of property owned by the decedent on the date of death. For Federal estate tax purposes, the term "fair market value" is defined as the price at which property would change hands between a willing buyer and a

---

[5] Based on this adjustment, respondent reduced the estate's tax deficiency to $16,326,408 and the accuracy-related penalty to $6,530,563.

willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.

With regard particularly to unlisted, closely held stock in corporations such as TPC (with regard to which no bid and asked prices or other arm's-length sales information is available), the statutory language of section 2031 provides that the value of stock in comparable public corporations shall be taken into account. Section 2031(b) provides --

> In the case of stock and securities of a corporation the value of which * * * cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange.

In utilizing, however, public companies to estimate the value of private, closely held companies, care must be taken to ensure that the public companies used are sufficiently comparable to the private companies being valued. In this regard, Rev. Rul. 59-60, 1959-1 C.B. 237, 242, cautions as follows:

> Although the only restrictive requirement as to comparable corporations specified in the statute [sec. 2031(b)] is that their lines of business be the same or similar, yet it is obvious that consideration must be given to other relevant factors in order that the most valid comparison possible will be obtained. * * *

Courts recognize that a comparable company valuation may be rejected where the companies relied on are not sufficiently similar to the company being valued. In Estate of Jung v. Commissioner, 101 T.C. 412, 433 (1993), significant differences between the companies used as comparables and the company being valued caused the Court to reject the comparable public company method. In Estate of Klauss v. Commissioner, T.C. Memo. 2000-191, an expert's comparability analysis was found to be inadequate because the expert failed to take into account differences in size, product mix, customer concentration, and other factors between the companies used as comparables and the company being valued.

With regard to "the other factors" referred to in section 2031(b) to be taken into account in the valuation of private, closely held companies, section 20.2031-2(f), Estate Tax Regs., explains, in part, as follows:

>      (f) Where selling prices or bid and asked prices
> are unavailable. If the provisions of paragraphs (b),
> (c), and (d) of this section are inapplicable because
> actual sale prices and bona fide bid and asked prices
> are lacking, then the fair market value is to be
> determined by taking the following factors into
> consideration:
>
>                 *   *   *   *   *   *   *

(2) In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors.

Some of the "other relevant factors" * * * are:  the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange.  However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * *

Rev. Rul. 59-60, 1959-1 C.B. 237, 238-239, lists eight

factors that are particularly relevant to the fair market value

of stock of closely held companies as follows:

(1)  The nature of the business and the history of the enterprise;

(2)  The general economic outlook and the particular outlook for the specific industry;

(3)  The financial condition of the business and its book value;

(4)  The earning capacity of the company;

(5)  The dividend-paying capacity of the company;

(6)  The value of any intangible assets and goodwill;

(7)  Previous sales of the stock and the size of the interest to be valued; and

(8)  The market price of stocks of corporations engaged in the same or a similar line of business having their

stocks actively traded in a free and open market, either on an exchange or over-the-counter.

Rev. Rul. 59-60, supra, acknowledges that a valuation of closely held stock is not an exact science, but rather involves a question of fact.  In this regard, Rev. Rul. 59-60, states --

A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance.  [1959-1 C.B. 237, 238.]

As noted, although in valuing the fair market value of corporate stock the future prospects of a company are relevant, generally an appraisal of fair market value is made without regard to actual subsequent-year events (i.e., to actual events occurring after the relevant valuation date).  Krapf v. United States, 977 F.2d 1454, 1458 (Fed. Cir. 1992).

The authorities allow, however, that in a number of situations subsequent-year events may be considered.  For example, actual subsequent-year events may be considered where such "evidence would make more or less probable the proposition that the property had a certain fair market value on a given date".  First Natl. Bank of Kenosha v. United States, 763 F.2d 891, 894 (7th Cir. 1985).  Subsequent-year events may be considered where they are "reasonably foreseeable", Saltzman v. Commissioner, 131 F.3d 87, 93 (2d Cir. 1997), revg. T.C. Memo.

1994-641, or "corroborate an appraisal that is based on facts known as of the valuation date", Jacobson v. Commissioner, T.C. Memo. 1989-606. Further, subsequent-year events may be admissible where relevant as to whether asserted expectations or prospects (as of the valuation date) were "reasonable and intelligent." Estate of Gilford v. Commissioner, 88 T.C. 38, 54 (1987); Estate of Jephson v. Commissioner, 81 T.C. 999, 1002 (1983); Regents Park Partners v. Commissioner, T.C. Memo. 1992-336.

As explained, in the case herein, for Federal estate tax purposes, both parties relied on valuation reports to estimate the date-of-death value of the estate's 20-percent interest in TPC. The estate's experts valued decedent's interest in TPC at approximately $1.750 million. Respondent's expert valued decedent's interest at approximately $32.4 million. The large disparity between the parties' valuations is startling.

Where conflicting valuations are submitted, a court may give different weight to the valuations and factors relied on by the parties. Casey v. Commissioner, 38 T.C. 357, 381 (1962). The Court is not bound to adopt either party's valuation carte blanche and is to reach a decision based on its analysis and its consideration of the evidence. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); McCord v. Commissioner, 120 T.C. 358,

374 (2003); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).[6]

In this case, the estate's experts impress us as too inexperienced, accommodating, and biased in favor of the estate.

Respondent's expert appears to have selected his comparable companies in a casual manner, based only on broad industry classification factors. He made significant errors in his calculations and analysis, and he made questionable and inadequately explained adjustments in his discounted cashflow valuation method.

The Estate's Valuation

As stated, in their original and revised valuation reports the estate's experts from Alaska calculated a total date-of-death value of $1,749,709 ($3.59 per share) for the estate's 20-percent common stock interest in TPC. In arriving at this number, the estate's experts concluded that no companies existed that were

_____

[6] Under sec. 7491, where a taxpayer produces credible evidence and otherwise satisfies the requirements of sec. 7491(a)(2), the burden of proof with respect to a factual issue relevant to ascertaining the taxpayer's tax liability (such as the fair market value of property) may shift from the taxpayer to respondent. Herein, in preparation for trial, the parties stipulated that the estate satisfied the requirements set forth in sec. 7491(a)(2). At trial, we determined that for purposes of sec. 7491(a)(1), the evidence produced by the estate as to the valuation of the TPC stock was to be treated as credible evidence. Therefore, respondent has the burden of proof with regard to the valuation of the estate's 20-percent stock interest in TPC.

comparable to TPC, and they valued TPC as an entity using the capitalization of income method.

In capitalizing the income of TPC, however, the estate's experts significantly downplayed TPC's long history of substantial income. They misstated certain financial data,[7] and they opined that TPC's business would be heavily and adversely impacted by the Internet and by other advances in technology, even though the estate's experts demonstrated no experience with the Internet- and technology-related companies.

Under the capitalization of income valuation method, a business is valued based on a projected stream of "normalized" or sustainable income, capitalized by a risk-adjusted rate of return. The basic steps involved in the capitalization of income method are as follows:

(1)  A capitalization rate for the business is selected;

(2)  The business's sustainable income is projected;

(3)  The capitalization rate is applied to the projected sustainable income for the business to calculate an operating value for the business; and

(4)  The amount or value of nonoperating assets owned by the business is added to the operating value of the business.

---

[7]  For example, in their original report, the estate's experts stated that TPC's growth in revenue for years subsequent to 1994 was flat, contrary to the fact that TPC's revenue reached record levels in each of the years 1994-99.

Obviously, the particular capitalization rate that is selected has a significant impact on the ultimate valuation and is intended to reflect risks or volatility associated with a company's income stream and seeks to reflect what a stockholder would require for a rate of return on an investment in the company being valued. The more risky and volatile the income stream is perceived to be, the higher the capitalization rate. Conversely, the more stable the income stream is perceived to be, the lower the capitalization rate.

In this case, the estate's experts calculated a capitalization rate of 30.5 percent for TPC. This capitalization rate was calculated by the estate's experts by adding together the following risk factors and percentages:

(1) 6 percent to reflect a risk-free rate of return (equal to the May 1, 1998, yield on 20-year U.S. Treasury securities);

(2) 7.8 percent to reflect an equity-risk premium (to compensate an investor for the risk of investing in stocks as compared to long-term U.S. government securities, reflecting the percentage by which the average annual return on large corporate stocks exceeds the average annual return on U.S. government securities, as provided in the Ibbotson Associates' Stocks, Bonds, Bills & Inflation Yearbook for the years 1926-97);

(3) 4.7 percent to reflect a small stock risk (to compensate an investor for the risk of investing in stock of a small corporation as compared to a large corporation, reflecting the percentage by which the average annual return earned on small corporate stock exceeds the average annual return on large corporate stock, as provided in the Ibbotson Associates' Stocks,

Bonds, Bills & Inflation Yearbook for the years 1926-97); and

    (4)    12 percent primarily to reflect risks to TPC relating to the Internet and to technology and to the loss of advertising revenue that might be related thereto, including perceived risks in TPC's management structure.

The 30.5-percent capitalization rate used by the estate's experts in the valuation of TPC stock is summarized below:

| Risk Factors | Percentage |
|---|---|
| Risk-Free Rate of Return | 6.0 |
| Corporate Equity Risk | 7.8 |
| Small Stock Risk | 4.7 |
| Internet & Management Risk | 12.0 |
| Capitalization Rate | 30.5 |

In estimating TPC's sustainable annual net income against which to apply the above capitalization rate, the experts for the estate adjusted TPC's historical income statements for 1993-97 as follows:

    (1)    Based on projections of TPC management, $10 million per year was subtracted from TPC's pretax income to reflect projected additional expenditures to maintain and to further TPC's presence on the Internet, and to develop additional technology-related projects; and

    (2)    Because TPC purportedly depreciated its fixed assets at a slower rate than the assets' actual rate of economic depreciation, the experts for the estate subtracted an amount to reflect the cost of additional economic depreciation to fixed assets not booked each year by TPC.

The adjustments made by the estate's experts to TPC's historic pretax income for 1993-97 are summarized below:[8]

| | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| Reported Pretax Income | $24,902,000 | $22,152,000 | $18,737,000 | $23,057,000 | $26,921,000 |
| Less Technology Expenditures | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| Less Additional Depreciation | 1,340,000 | 756,000 | 920,000 | 1,183,000 | 1,078,000 |
| Adjusted Pretax Income | $13,562,000 | $11,396,000 | $ 7,817,000 | $11,874,000 | $15,843,000 |

In order to then calculate an after-tax average sustainable annual net income for TPC, using the above adjusted pretax income figures for 1993-97, the estate's experts made the following calculations:

| Year | Adjusted Pretax Income |
|---|---|
| 1993 | $13,562,000 |
| 1994 | 11,396,000 |
| 1995 | 7,817,000 |
| 1996 | 11,874,000 |
| 1997 | 15,843,000 |
| Total Adj. Pretax Income for 5 Years | $60,492,000 |
| Divided by Number of Years | 5 |
| TPC Average Annual Sustainable Net Income | 12,098,000 |
| Less 35% Taxes | 4,234,000 |
| TPC After-Tax Average Sustainable Annual Net Income | $ 7,864,000 |

The experts for the estate then applied their 30-percent capitalization rate for TPC to their $7,864,000 after-tax average sustainable annual net income for TPC and thereby calculated a value for TPC of $25,784,000 ($7,864,000 ÷ .305 = $25,784,000).

---

[8] In this and the following tables, generally, the numbers are rounded to the nearest thousand.

After calculating the above $25,784,000 entity value for TPC, the estate's experts calculated a prediscounted value for the estate's 20-percent interest in TPC as follows:

| | |
|---|---|
| Value of TPC | $25,784,000 |
| Multiplied by Estate's 20.57% Interest | .2057 |
| Prediscounted Value of Estate's Interest | $ 5,304,000 |

The estate's experts then discounted the above $5,304,000 by applying a 40-percent minority interest discount and an additional 45-percent lack of marketability discount to arrive at a date-of-death value of $1,750,000 for the 487,440 shares of TPC common stock includable in decedent's estate, as summarized below:

| | |
|---|---|
| Prediscounted Value of Estate's 20.57% Interest | $5,304,000 |
| Less 40% Minority Interest Discount | 2,122,000 |
| Subtotal | $3,182,000 |
| Less 45% Lack of Marketability Discount | 1,432,000 |
| Value of Estate's 20.57% TPC Stock Interest | $1,750,000 |

The estate's experts' 40-percent minority interest discount was based primarily on their reading of general valuation texts.[9]

The estate's experts' 45-percent lack of marketability discount was based largely on the following factors: (1) The stated intent of TPC's management that it had no interest in

_____

[9] Coolidge, "Survey Shows Trend Toward Larger Minority Discounts", Estate Planning 282 (Sept. 1983); Coolidge, "Fixing Value of Minority Interest in a Business; Actual Sales Suggest Discount as High as 70%", Estate Planning 141 (Spring 1975).

going public; (2) the absence of sales of TPC stock for the 10 years prior to May 2, 1998; (3) the inability of any stockholder of TPC to obtain control of TPC by purchasing merely the estate's 20-percent interest; and (4) the inability of the holder of the estate's block of TPC stock to force a liquidation of TPC.

The estate's experts, however, provided no credible explanation for why they used 40-percent and 45-percent minority interest and lack of marketability discounts, as distinguished from some other numbers -- e.g., 20 percent or 30 percent.

Respondent's Valuation

Respondent's expert estimated a date-of-death fair market value for TPC of $225 million and a date-of-death fair market value for the estate's 20-percent TPC stock interest of $32.4 million. Respondent's expert utilized two valuation methods to value TPC -- the comparable public company method and the discounted cashflow method. In his revised report, in the process of making certain corrections to errors made in his original report, respondent's expert made significant questionable adjustments in his discounted cashflow method that are inconsistent with the methodology utilized in his original report. In his original and revised reports respondent's expert did not utilize the capitalization of income method.

Using the comparable public company method, respondent's expert identified 11 publicly traded companies and treated them as comparable to TPC on the basis of only two broad criteria as follows:

(1)   Classification under the same general U.S. Department of Labor Standard Industrial Codes as TPC (namely, Code #2731 -- Books:  Publishing, or Publishing and Printing, and Code #2741 -- Miscellaneous Publishing); and

(2)   Reported positive cashflows for 1995-97.

Set forth below in schedule format is a listing of TPC and the 11 companies selected by respondent's expert as comparable to TPC, a brief description of the primary type of content material which each company, as of July 31, 2000, published, and the amount of each company's 1997 reported revenue:

| Company | Publication Material | 1997 Revenue |
|---|---|---|
| TPC | Industrial buying directories | $   240,110,000 |
| American Educational Products | Educational textbooks, journals, and games | 8,392,000 |
| Harcourt General, Inc. | Scholarly books and journals, educational material, popular books. Owns the Neiman Marcus Group, Inc. | 3,691,639,000 |
| Houghton Mifflin Co. | Textbooks and educational reference materials | 797,320,000 |
| Intervisual Books, Inc. | Popup and dimensional novelty books | 18,733,000 |
| McGraw-Hill Co. | Educational books and magazines. Owns Standard & Poor's and four television stations | 3,534,095,000 |
| Millbrook Press, Inc. | Children's nonfiction books | 12,573,000 |
| Nelson (Thomas), Inc. | Religious and family value books | 243,436,000 |

| Company | Publication Material | 1997 Revenue |
|---|---|---|
| Readers Digest Association | Magazines, and educational, condensed, and popular books, recorded music collections, and home videos | $2,839,000,000 |
| Scholastic Corp. | Children's books and classroom and professional magazines | 966,300,000 |
| Touchstone Applied Science Associates | Reading and English testing materials | 4,588,000 |
| Wiley (John) & Sons | Professional and reference works, consumer books, and textbooks | 431,947,000 |

From publicly reported financial information relating to the above public companies, respondent's expert calculated four financial measurement ratios applicable to each company -- namely, stock price to net income, stock price to cashflow, stock market value to book value of tangible and intangible assets, and stock price to revenue.

Applying the ratios so calculated to the 11 companies, respondent's expert calculated the median ratio for each measurement, and he applied that respective median ratio as a multiple to TPC's 5-year (1993-97) average annual net income, cashflow, book value, and revenue as follows:

| | Net Income | Cashflow | Book Value | Revenue |
|---|---|---|---|---|
| TPC 5-Year Average | $ 13,259,000 | $ 15,187,000 | $148,606,000 | $235,995,000 |
| Multiple Based on Median Ratio for 11 Public Companies | 25.9 | 14.3 | 2.5 | 1.04 |
| Total for TPC | $343,659,000 | $216,780,000 | $364,787,000 | $245,681,000 |

Using the $216,780,000 (rounded to $217 million) calculated above for the cashflow ratio (apparently because the cashflow

ratio was the most consistent measurement ratio as between the 11 companies), respondent's expert adjusted upward this $217 million to take into account the higher valuation amounts reflected by the other measurement ratios, and he calculated a total value for TPC under his comparable public company method of $260 million.

As stated, in both his original report and in his revised report, respondent's expert also valued TPC using the discounted cashflow method. Thereunder, using TPC's 1997 reported income, respondent's expert calculated a 2.7-percent annual income growth rate (in his original report) and a 2.4-percent annual income growth rate (in his revised report), which growth rates he applied to TPC's actual net cashflow for 1997 to estimate TPC's net cashflow for the subsequent 5 years (1998-2002).

As explained supra, however, in his original report, for TPC's 1997 net cashflow number, respondent's expert used $13,069,000. This number was incorrect and was significantly overstated because respondent's expert added back to TPC's 1997 cashflow deferred taxes of $13,294,000, instead of the correct deferred tax add-back of only $1,609,793.[10]

To his estimated TPC net cashflow numbers for 1998-2002 (based on his calculation of TPC's $13,069,000 net 1997

---

[10] In his revised report, in calculating TPC's 1997 net cashflow, respondent's expert used the corrected deferred tax add-back of $1,609,793. This correction resulted in a revised or new number for TPC's 1997 net cashflow of only $1,384,000.

cashflow), respondent's expert applied a discount rate to calculate a present value, as of May 2, 1998, of the estimated 1998-2002 net cashflow.

Respondent's expert's discount rate for each year was based on his estimate of TPC's cost of equity, calculated under the capital asset pricing model, and involved the following elements:

(1)　A risk-free rate of return of 5.933 percent, equal to the U.S. government long-term bond rate as of May 2, 1998;

(2)　A market-risk premium that varied to reflect the risk of investing in a private company and the perceived risks of investing in stocks rather than in long-term government bonds; and

(3)　An estimate of unlevered beta for TPC of 0.60 to reflect the volatility or level of risk associated with TPC's stock as compared to the volatility of the stock market as a whole (where the market has an overall beta of 1).[11]

In his original report, respondent's expert also calculated and added to his present value calculations of TPC's estimated net cashflow for 1998-2002 a $153,174,000 estimate of TPC's residual value, based on a discounted "terminal value" for TPC. In the words of respondent's expert, this terminal value

---

[11]　The discount rate which respondent's expert applied to TPC's estimated net cashflow for each year is set forth below:

| Year | Percentage |
|------|-----------|
| 1998 | 10.482 |
| 1999 | 9.855 |
| 2000 | 9.497 |
| 2001 | 9.246 |
| 2002 | 9.145 |

"incorporates all [estimated cash] flows [for TPC] after Fiscal 2002" discounted back to the end of 2002.  With his discounted terminal value for TPC added to his present value calculation of TPC's estimated net cashflow for 1998-2002, respondent's expert concluded in his original report that TPC had a May 2, 1998, fair market value of $212.6 million as follows:

| Fiscal Year | Present Value of Estimated Cashflows |
|---|---|
| 1998 | $ 13,141,000 |
| 1999 | 12,637,000 |
| 2000 | 11,884,000 |
| 2001 | 11,217,000 |
| 2002 | 10,579,000 |
| Subtotal | $ 59,458,000 |
| Plus Discounted Terminal Value | 153,174,000 |
| Valuation of TPC | $212,632,000 |

In his revised report, however, after adjusting his add-back to TPC's 1997 net cashflow for the corrected $1,609,793 deferred taxes (discussed supra) (which as indicated resulted in a greatly reduced calculation of TPC's estimated net cashflow number for 1998-2002), respondent's expert switched his residual value calculation for TPC after 2002 by estimating what he refers to as a $152,567,000 "liquidation" value for TPC.  Respondent's expert's revised discounted cashflow calculation using the much reduced cashflow numbers but a liquidation (rather than a terminal) value for TPC is summarized below:

|                        | Present Value of Estimated |
|------------------------|----------------------------|
| Fiscal Year            | Cashflows                  |
| 1998                   | $  1,390,000               |
| 1999                   | 1,333,000                  |
| 2000                   | 1,251,000                  |
| 2001                   | 1,178,000                  |
| 2002                   | 1,108,000                  |
| Subtotal               | $  6,260,000               |
| Plus Liquidation Value | 152,567,000                |
| Valuation of TPC       | $158,827,000               |

In calculating the residual value for TPC to be added to his net cashflow projections for 1998-2002, respondent's expert's switch in his revised report from a terminal value to a liquidation value calculation appears to us to be an effort on the part of respondent's expert to keep the valuation for TPC relatively high.[12]

---

[12] Generally, terminal value is used to compute an entity's residual value beyond the period for which an entity's net cashflows are projected, whereas liquidation value generally is used only when the entity being valued has plans to liquidate at the end of the projection period. Copeland, et al., Valuation 284 (3d ed. 2000) (providing that liquidation value should not be used "unless liquidation is likely at the end of the forecast period"). Here, TPC's management, as of May of 1998, had no plans to liquidate TPC. Using the correct $1.609 million in deferred tax add-back, the calculation under respondent's expert's discounted cashflow method using a terminal value calculation for TPC's 2002 residual value would have reflected a May 2, 1998, fair market value for TPC of only $21.7 million as follows:

|                          | Present Value of Estimated |
|--------------------------|----------------------------|
| Fiscal Year              | Cashflows                  |
| 1998                     | $ 1,390,000                |
| 1999                     | 1,333,000                  |
| 2000                     | 1,251,000                  |
| 2001                     | 1,178,000                  |
| 2002                     | 1,108,000                  |
| Subtotal                 | $ 6,260,000                |
| Plus 2002 Terminal Value | 15,415,372                 |
| Valuation of TPC         | $21,675,372                |

In his revised report, respondent's expert, apparently still not satisfied with his revised $158.8 million valuation for TPC (using the corrected deferred tax add-back and a liquidation value for TPC), goes on to recalculate much higher projected net cashflow numbers for TPC for 1998-2002, and he calculates three higher valuations for TPC.

The major aspect or component of respondent's expert's recalculation of TPC's projected net cashflows for 1998-2002 is his use of TPC's 1997 yearend total working capital, instead of TPC's 1997 change in net working capital. The effect of using yearend total working capital (against which his growth rate for TPC was applied) was to significantly increase TPC's estimated cashflow for 1998-2002 by approximately $12 million a year.

Based on the various calculations under his various methods, respondent's expert ultimately concluded that the total fair market value for TPC as an entity, as of May 2, 1998, was $225 million.

To the estate's $46,282,500 20-percent share of this $225 million ($225,000,000 x .2057 = $46,282,500), respondent's expert applied a 30-percent lack of marketability discount and arrives at a date-of-death value of $32,393,000 for the estate's 20-percent stock interest in TPC.

Respondent's expert bases his 30-percent (as opposed to a higher) lack of marketability discount on the following:  (1) TPC

was not publicly traded; (2) historically, TPC was profitable;
(3) investment risks associated with TPC were moderate; (4) TPC
had consistently paid cash dividends; (5) as of May 2, 1998, TPC
held more than $137 million in net liquid assets; and (6) the
estate owned the single largest block of TPC stock.  Respondent's
expert's calculation of the $32,393,000 valuation for the
estate's 20.57-percent stock interest in TPC may be summarized as
follows:

| | |
|---|---:|
| Value of TPC | $225,000,000 |
|    Multiplied by Estate's Interest in TPC | 20.57% |
| Prediscounted Value of Estate's Interest | $ 46,282,500 |
|    Less 30% Marketability Discount | 13,884,750 |
| Value of Estate's 20.57% Interest in TPC | $ 32,393,000* |

> * $32,393,000 represents the calculation as reflected
>   in respondent's expert's revised report.  The
>   corrected math calculates to $32,397,750.

As indicated, respondent's expert does not apply a minority
interest discount to the estate's 20-percent TPC stock interest.
Rather, respondent's expert states that his discounted cashflow
method of valuation inherently reflects a minority interest in
TPC and therefore that no separate or additional minority
interest discount is appropriate.

Our Analysis

As mentioned, we find both the estate's and respondent's valuations to be deficient and unpersuasive in calculating the fair market value of TPC as an entity and in calculating the fair market value of the estate's 20-percent interest therein.

In this case, the estate, the executors of the estate, and the underlying company, the stock of which is being valued, were all headquartered and based in the New York City metropolitan area, but the estate hired a lawyer and an accountant from Alaska, both with relatively little valuation experience, to value the estate's 20-percent interest in TPC. The estate's experts valued TPC and the estate's interest in TPC in an aggressive manner largely by over calculating as of the May 2, 1998, valuation date, the risks associated with the Internet and technology and by applying excessive minority and lack of marketability discounts.

Goerig is a lawyer with an audit and tax dispute resolution practice, and a tax return preparer, and he undertakes occasional valuations for small businesses and private individuals. From his resume, he appears to have attended limited appraisal courses, other than a few courses while working for respondent many years ago. Goerig also was appointed to act as administrator for the estate to handle the anticipated audit by respondent of the estate's Federal estate tax return, a role

which we regard as somewhat in tension with his role as a purported independent valuation expert for the estate.

Wichorek provides accounting and tax preparation services, does business consulting, and undertakes occasional valuations for small businesses, generally in the context of divorce and property settlement disputes. He belongs to no professional organizations or associations relating to his appraisal or valuation work.

Although we admitted into evidence the estate's valuation reports and treated them as credible, we regard those reports and the testimony of the estate's experts to be only marginally credible. Goerig and Wichorek were barely qualified to value a highly successful and well-established New York City-based company with annual income in the millions of dollars.[13]

In our opinion, in computing the sustainable net income of TPC, the estate's experts incorrectly applied a 12-percent risk factor relating to the Internet and technology. We acknowledge that while the Internet posed certain risks to TPC, the Internet also provided significant new business and financial opportunities to TPC to increase revenue and profitability. As

_____

[13] At trial, the estate called additional expert witnesses in an attempt to provide corroboration for aspects of the valuation of TPC and of the estate's interest in TPC by Goerig and Wichorek. Such witnesses, however, have not cured the concerns we have with Goerig's and Wichorek's valuation of TPC and of the estate's interest therein.

of May 2, 1998, TPC appeared to be well situated on the Internet, and TPC's future as to its Internet operations appeared good, if not, in the words of TPC's president, "great".  As stated in the estate's experts' report, as of May of 1998, TPC "appears to be in a strong overall financial position when compared to the industry.  [TPC] has more liquidity, no leverage, and operates more profitably than the median industry.  Based on the financial analyses of [TPC], the business has less financial risk than does the median company in the same industry."

The use by the estate's experts of a 12-percent technology-related risk factor, particularly in light of their failure to project any additional income to be produced from technology-related expenditures, seems to us inappropriate and unjustified.

Supporting our conclusion that TPC's risks relating to the Internet and technology do not support a 12-percent risk factor, we note that, during its 1998 fiscal year, TPC paid out cash dividends to its stockholders in excess of $7 million, a significant increase over total cash dividends paid out to stockholders in prior years and inconsistent with any management perception that, as of May of 1998, or in the near future, TPC faced extraordinarily risky additional Internet- and technology-related expenditures.

TPC's 1998 cash dividends, particularly in light of the lower level of stockholder dividends that had been paid in prior

years, are indicative of an optimistic management outlook for TPC as of May of 1998.

As explained by TPC's president, although its profitability margins and net income were declining due to increased spending on technology-related projects, in 1997 and 1998 TPC experienced record revenue. Not until 2001 was TPC's total revenue adversely affected in a significant way by the Internet and by new technology. Mr. Holst-Knudsen explained at trial as follows:

> Q. [By petitioner's counsel] When, if at all, did [TPC] take what you've termed a "hit"?
>
> A. We were taking a hit in the sense of, as I said before, the investments we were making. That hit became more serious as we went on. I would say that the years 2001, 2002, and the fiscal year that will close this year is when we really began to take the hit on our top line, on revenues. We have shed approximately 30 percent of our revenue, and about 35 to 40 percent of our account basis disappeared over that period of time.

The additional $10 million a year in technology-related expenditures that the estate's experts factored into their projections of subsequent-year income, and that we also allow, we believe to be an adequate indication or quantification of the level of Internet- and technology-related risks TPC faced, as of May 2, 1998.

Also, we regard TPC as an extremely well managed company, with top quality managers throughout the company. We allow no

separate risk factor for what the estate's experts refer to as management risk.

Respondent asserts that the estate's $25 million valuation for TPC as an entity (and $1.7 million for the estate's 20-percent interest therein) is absurd in light of TPC's 1997 fiscal yearend book value in the range of $148 million. Respondent also asserts that if we utilize the capitalization of income method to value TPC (as did the estate's experts and as we do), we should take the cash and short-term liquid assets from TPC's balance sheet, treat them as nonoperating assets, and add them to any calculation of the capitalized income of TPC that we make.

From the end of its 1993 fiscal year through the end of its 1997 fiscal year, TPC's cash and outside short-term (more than 3-month) investments reported on its yearend balance sheets increased from $42.3 million to $73.6 million. Throughout the 1990s, TPC increased its short-term liquid investments and still paid significant cash dividends to its stockholders. Not until its 2000 fiscal year does TPC's yearend balance sheet reflect any significant reduction in outside short-term investments.

On each of TPC's 1997 and 1998 fiscal yearend balance sheets, approximately $68 million is shown as outside short-term investments with an investment term of more than 3 months. We treat these $68 million in short-term liquid investments as nonoperating assets to be added to the valuation of TPC under a

capitalization of income valuation method.  We are not persuaded

that these liquid investments should be treated as operating

assets due to TPC's commitment to advance sales commissions.[14]

TPC's yearend cash on hand, however, is not to be treated as

anything other than an operating asset and is not to be treated

as an add-on in the calculation of TPC's value under the

capitalization of income method.

As to the valuation of the particular 20-percent block of

TPC stock includable in the estate, we disagree with the large

minority (45-percent) and lack of marketability (40-percent)

discounts utilized by the estate's experts in calculating the

fair market value of the estate's 20-percent TPC stock interest.

As noted, the estate's experts based their minority and lack

of marketability discounts on general studies and not on the

facts of this case.  The experts for the estate selected discount

rates that were extreme and highly favorable for the estate,

without any credible substantive discussion of how the facts of

this case support such particular discounts.

Also, as we have noted, as of May of 1998, at least one

outside, public investor owned and had owned for at least 10

years a substantial TPC stock interest.  The evidence before us

does not suggest any problem, discontent, dissatisfaction, or

---

[14] In our calculation of prior year TPC income, we also add-back additional depreciation that the estate's experts add-back and that respondent apparently does not dispute.

other concern with the presence of this outside stockholder. The longstanding stock interest of this actual outside investor in TPC suggests that a hypothetical outside investor would be interested in an investment in TPC in the nature of the minority 20-percent stock interest held by the estate.

We reject the minority and lack of marketability discounts used by the estate's experts.

Turning to respondent's expert's valuation, respondent's expert appeared to be concerned with numbers only and did not appear to make an effort to base his valuation of TPC on a real company. His sterile approach is reflected both in his comparable public company analysis and in his discounted cashflow analysis.

In his comparable public company analysis, respondent's expert used information on 11 companies which, only in a broad sense, relate to TPC. Valuation of a company under a comparable public company method may be simple and quick, but such an approach also may be easily misapplied. With regard to this concern, valuation textbooks caution:

> The allure of multiples is that they are simple and easy to relate to. * * *
> By the same token, they are also easy to misuse and manipulate, especially when comparable firms are used. Given that no two firms are exactly similar in terms of risk and growth, the definition of comparable firm is a subjective one. Consequently a biased analyst can choose a group of comparable firms to confirm his or her biases about

a firm's value * * *.  [Damodaran, Damodaran on Valuation 16
(1994).]

and further:

Since the selection of comparable firms has such a
paramount role in valuation with multiples, special
attention must be paid to selecting a true comparable
sample of firms -- firms that are in the same industry,
employ the same technology, apply to similar
clienteles, are of similar size, and so on.  * * *
[Benninga & Sarig, Corporate Finance A Valuation
Approach 330 (1997).]

We reject respondent's expert's 11 companies as comparable

to TPC.  See Estate of Clarke v. Commissioner, T.C. Memo. 1976-

328, where we rejected public companies as comparable,

explaining as follows:

the fact that two companies are both part of the same
general industry does not, as respondent's expert
implies, make them comparable per se.  Such a standard
clearly ignores the interplay of the myriad of complex
factors and features that must be accounted for in any
meaningful comparison.  Rather we think it imperative
that the characteristics of the subject company and the
purportedly comparable company relevant to the question
of value be isolated and examined so that a significant
comparison can be made.  Those factors include the
respective products, market, management, earnings,
dividend paying capacity, book value, and position in
the industry of each company.  See Cent. Trust Co. v.
United States, 305 F.2d 393 (Ct. Cl. 1962).  [Emphasis
added.]

Also, we reject respondent's expert's discounted cashflow

analysis.  As explained, significant errors were made therein,

and respondent's expert's numerous recalculations were suspect, not sufficiently explained, and not persuasive.

Also, we disagree with respondent's expert that no discount should be applied to the estate's 20-percent interest to reflect its minority status.  In cases cited just in the parties' briefs, the following minority discounts are observed:  25 percent--N. Trust Co. v. Commissioner, 87 T.C. 349, 389 (1986); 10 percent-- Estate of Heck v. Commissioner, T.C. Memo. 2002-34; 15 percent and 20 percent--Gow v. Commissioner, T.C. Memo. 2000-93, affd. 19 Fed. Appx. 90 (4th Cir. 2001).

In cases cited in the parties' briefs, the following lack of marketability discounts are observed:  20 percent--N. Trust Co. v. Commissioner, supra at 389; 30 percent--Estate of Desmond v. Commissioner, T.C. Memo. 1999-76; 40 percent and 45 percent-- Barnes v. Commissioner, T.C. Memo. 1998-413; 30 percent-- Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996); 30 percent--Estate of Gallo v. Commissioner, T.C. Memo. 1985-363.

On the evidence before us in this case, we conclude that the appropriate valuation of the estate's 20-percent stock interest in TPC, as of May 2, 1998, should be based on a capitalization of TPC's estimated sustainable net income for 1998-2002 calculated as an average of TPC's 1993-97 income with an additional $10 million per year in expenditures relating to projected Internet-

and technology-related expenditures.  The 30.5-percent

capitalization rate used by the estate's experts should be

reduced by 12 percent, from 30.5 percent to 18.5 percent, to

better reflect our belief that the Internet, as of May 2, 1998,

constituted a factor for TPC almost as positive as it was

negative.  Also, $68 million of nonoperating assets should be

added.

Our calculation of the appropriate 18.5-percent

capitalization rate is as follows:

| Risk Factors | Percentage |
|---|---|
| Risk-Free Rate of Return | 6.0 |
| Corporate Equity Risk | 7.8 |
| Small Stock Risk | 4.7* |
| Internet & Management Risk | 0.0 |
| Capitalization Rate | 18.5 |

* We note that, in spite of the size of TPC,
  respondent did not discretely challenge
  this small stock discount.

In discounting to reflect the estate's minority 20-percent

interest in TPC, we allow a 15-percent minority interest discount

and a 30-percent lack of marketability discount.  We scale back

the minority and lack of marketability discounts from those used

by the estate's experts because, as noted above, we find the

estate's experts' numbers to be arbitrary and without support.

We believe a minority interest discount of 15 percent is a

better reflection of the estate's 20-percent common stock

interest in TPC.  Although a minority interest, the holder of

such interest would own the single largest block of stock in TPC,

a major, well-established, well-run company with relatively few stockholders, in which a longstanding outside investor is already present and apparently content.

With regard to the lack of marketability discount, we believe a 30-percent lack of marketability discount adequately reflects difficulties the estate and a hypothetical investor might have in marketing the estate's 20-percent TPC stock interest. Indeed, but for the fact that respondent's expert allowed a 30-percent discount for lack of marketability, we might have been inclined to reduce this discount. A discount any higher would not appear to be justified, particularly in light of the presence among TPC's stockholders of a significant outsider stockholder who already owns a relatively large, minority block of TPC stock. We also note the dividend-paying history of TPC, and TPC's plans, as of May of 1998, to continue its practice of paying substantial cash dividends, which subsequent-year dividends would allow a holder of a 20-percent interest in TPC to recover annually, based on prior-year dividends paid, in excess of one quarter of a million dollars.

We conclude that the date-of-death value of TPC as an entity, as of May 2, 1998, is $110,508,000 and that the date-of-death value of the estate's 20.57-percent interest in TPC is $13,525,240, or $27.75 per share.

Our calculation of the fair market value of TPC as an entity and of the estate's 20.57-percent interest in TPC is set forth below:

| | |
|---|---|
| Capitalization Rate | 18.5% |
| Minority Discount | 15% |
| Marketability Discount | 30% |

### TPC's Sustainable Net Income

| Year | Pretax Income |
|---|---|
| 1993 | $ 13,562,000 |
| 1994 | 11,396,000 |
| 1995 | 7,817,000 |
| 1996 | 11,874,000 |
| 1997 | 15,843,000 |
| Total Pretax Income | $ 60,492,000 |
| Divided by Number of Years | 5 |
| Average Pretax Income | $ 12,098,000 |
| Less Estimated 35% Taxes | ( 4,234,000) |
| Sustainable Net Income | $ 7,864,000 |
| Divided by Capitalization Rate | 18.5% |
| Subtotal | $ 42,508,000 |
| Plus Nonoperating Assets | 68,000,000 |
| Value of TPC | $110,508,000 |

### Value of Estate's 20-Percent Stock Interest

| | |
|---|---|
| Value of TPC | $110,508,000 |
| Multiplied by Estate's Percent Interest | 20.57% |
| Subtotal | $ 22,731,496 |
| Less 15% Minority Discount | 3,409,724 |
| Subtotal | $ 19,321,771 |
| Less 30% Marketability Discount | 5,796,531 |
| Value of Estate's 20% TPC Interest | $ 13,525,240 |
| Per-Share Value | $27.75 |

Taking into account all of the evidence before us and the arguments of the parties, we believe that our above valuation

constitutes a fair and appropriate valuation of TPC and of the estate's interest in TPC.

Accuracy-Related Penalty

Generally, a 20-percent penalty is imposed on "any portion of an underpayment of tax required to be shown on a return" where the underpayment constitutes a substantial estate tax valuation understatement.  Sec. 6662(a) and (b)(5).

For purposes of section 6662, an estate tax valuation understatement is treated as substantial where property required to be reported on an estate tax return is reported at a value 50 percent or less than the value eventually determined by the court.  Sec. 6662(g)(1).  Where property is reported at a value less than 25 percent of the value eventually determined by the court, the penalty imposed under section 6662 is increased from 20 percent to 40 percent.  Sec. 6662(h).

We have determined the value of the estate's 20-percent interest in TPC to be $13,525,240.  Because the value reported by the estate for its 20-percent interest in TPC ($1.8 million) is less than 25 percent of the value determined herein ($13,525,240 x .25 = $3,381,310), unless an exception to the application of the section 6662 penalty applies, the estate would be liable for a 40-percent penalty on its understated valuation.

Under section 6664, an exception is provided to the imposition of a section 6662 accuracy-related penalty where a

taxpayer establishes that there was reasonable cause for the understatement and that the taxpayer acted in good faith.  Sec. 6664(c).

The regulations provide that whether an understatement of tax is made in good faith and due to reasonable cause will depend upon the facts and circumstances of each case.  Sec. 1.6664-4(b), Income Tax Regs.  In determining whether a taxpayer acted reasonably and in good faith with regard to the valuation of property, factors to be considered include:  (1) Whether the value reported on the tax return was based on an appraisal; (2) the methodology and assumptions underlying the appraisal; (3) the appraised value; (4) the circumstances under which the appraisal was obtained; and (5) the appraiser's relationship to the taxpayer.  Sec. 1.6664-4(b)(1), Income Tax Regs.

The estate contends that it acted reasonably and in good faith in the valuation of the estate's 20-percent TPC stock interest, in filing its Federal estate tax return, and in reporting thereon the value of the TPC stock.

The valuation herein of the estate's 20-percent stock interest in TPC was particularly difficult and unique.  Companies comparable to TPC were not found.  Valuation of the estate's 20-percent TPC stock interest under the capitalization of income and under the discounted cashflow methods involved a number of difficult judgment calls.  We believe it noteworthy and relevant

to the appropriateness of the section 6662 penalty that even respondent's expert made significant errors in his various calculations.

Complicating the valuation presented to the parties and to the Court herein was the difficult question as to how the Internet and the risks and opportunities associated therewith should be regarded as affecting TPC. The evaluation in this case of such intangible risks and opportunities was difficult and imprecise.

Certainly, the experts for the estate were aggressive in their relatively low valuation of TPC. Respondent's expert was aggressive in his relatively high valuation of TPC. We note that our valuation of TPC and of the estate's 20-percent interest in TPC is closer to the estate's valuation than to respondent's valuation.

On the record before us, we believe it inappropriate to impose the accuracy-related penalty. The estate is not liable for the accuracy-related penalty.

Accordingly,

Decision will be entered under Rule 155.